Rockingham,
April 1, 1930.

## Adolph G. Kruger

*v.*

## Exeter Manufacturing Company.

*William H. Sleeper* and *John W. Perkins* (*Mr. Sleeper* orally), for the plaintiff.

*Ernest L. Guptill, John L. Mitchell* and *Ralph G. McCarthy* (*Mr. Mitchell* orally), for the defendant.

BRANCH, J.   The evidence of the defendant's negligence was abundant.   It is plain that the plaintiff received a specific order to perform an extremely dangerous task.   Any adjustment of the clutch made while the pulley was running necessitated the use of tools inside the circumference of the revolving rim, in close proximity to the moving belt and within four or five inches of the rapidly whirling spokes.   From the testimony of the plaintiff it appears that he had the first two perils, from the rim and the belt, definitely in mind. The reality of the rim danger was evidenced in a striking manner by the fact that defendant's expert received a cut or burn on his little finger while making an experimental adjustment of this clutch before he testified.   There was expert testimony to the effect that no adjustment ought to be allowed "with the machine going."   More-

over, this was a very difficult clutch to adjust under the circumstances "owing to the wear and the fine adjustment necessary between the shoe and rim of the pulley." It appeared that this adjustment should be made to a sixteenth of an inch, and, in doing the work, it was necessary to use care and skill to prevent the shoe from coming in contact with the revolving rim. If it happened to "scuff on there a little" the clutch might "kick over" or "scuff over a little bit," and if this happened while the workman was using a wrench, it "would tend to throw the wrench from his hand." There was evidence that the very act of tightening a set screw, which the plaintiff was performing at the time of the accident, might produce this effect. The net result of the evidence was to corroborate the testimony of the plaintiff's expert that the work of adjusting this clutch "should be done by a mechanic with a gauge and proper tools."

It was very clear that the wrench furnished by the defendant and used by the plaintiff was unsuitable for this work in respect to both type and size, and that, in mechanical condition, it was extraordinarily defective. It was a twelve inch monkey-wrench, and plaintiff's expert testified that "no mechanic would ever think of using a twelve inch monkey-wrench on a small set-screw like that." Either a socket wrench or a forged wrench should be used because there is "very little possibility of those wrenches slipping. . . . Any wrench with a solid jaw is preferable to the best kind of a monkey-wrench." Furthermore, there is much more danger that a big wrench will slip when used on a small nut than on a large one, because "with your extra pressure on there it will slide right around the corners of that nut," and this danger is again increased if the jaws of the wrench are placed endwise over the top of the nut instead of sidewise around it. Mechanics are instructed never to use a monkey-wrench in that position. The limited space in which the plaintiff's work had to be done prevented the use of a twelve inch wrench in the proper sidewise position "on account of the rim of the pulley turning the belt in the way," so that the plaintiff was forced by necessity to use it in the most dangerous manner possible.

The mechanical defects in this particular wrench were such that it ought long ago to have been withdrawn from service. The wooden part of the handle was gone, leaving only the steel shaft to hold it by. The socket of the adjustment screw which controlled the position of the inner jaw was so worn that the screw would not stay in position. An attempt had been made to obviate this defect by wrapping a wire around the screw and body of the wrench, but this attempt was only

partially successful and the result was that the screw did not hold the jaw firmly in place. It was likely to give way when pressure was applied. The jaws themselves were considerably worn so that they did not meet squarely.

The plaintiff had never been instructed as to the dangers involved in making an adjustment of the clutch while the pulley was in motion, or the correct method of doing the work, or the special danger of using a large monkey-wrench for that purpose, or the additional dangers incident to the use of this particular wrench. It might, therefore, be found that the defendant was negligent in putting the plaintiff to work in an unsafe place with a defective tool and without instructions.

The two contentions most strongly urged by the defendant are (1) that under the evidence, the cause of the accident was wholly a matter of conjecture, and (2) that the plaintiff failed to sustain the burden of proving that he did not assume the risk of such an injury as he received.

1. Although there is no direct testimony to explain how the plaintiff was hurt, the circumstances are sufficient to support a finding that the accident happened as he claimed it did. His version of the occurrence ends with his statement that as he was tightening the set screw he felt something give way, after which he knew nothing. It appeared, however, that while adjusting the clutch, the plaintiff stood facing the machine and the rear of the clutch upon the right hand side of the shaft which carried the shifting mechanism. The position of the cross-member was such that the set screw was about three and one-half feet above the floor and about seven inches above and seven inches to the left of the shaft, so that the plaintiff's hands as he worked were at about the height of his waist. Three fingers of his right hand had previously been amputated. In tightening the set screw he held the steel shaft of the handle in his left hand, and with his right, held the head of the wrench so as to keep it tight on the head of the screw. The position thus assumed was demonstrated to the jury and from the course of the oral argument we infer that the plaintiff thus undertook to perform the operation of tightening the set screw with his hands crossed. If this be so, the use of his hands in such an awkward manner is probably explained by the amputation of his fingers above referred to.

In regard to the situation which existed at the moment preceding the accident, he testified as follows: "Q. When that gave way do you know whether your wrench had hold of the adjustment nut all

right? A. Yes. Q. And you had your hand there to see that it was on all right? A. That it wouldn't slip off; it was natural." With things in this posture the most obvious explanation for his subsequent loss of control over the wrench is that the clutch suddenly kicked over because the shoe was brought in contact with the rim of the pulley.

After the accident the plaintiff was found on the floor in a kneeling position facing the clutch, resting on his right knee and right hand, with his left arm caught in the shifting mechanism of the clutch and his head hanging down. The wrench lay in a pool of blood underneath the clutch. The plaintiff's injuries consisted of "a compound fracture; that is an open fracture; of the frontal sinus on the right side of his head, with a complete fracture of both upper jaws; ... the destruction of the left eye, and a fracture of the orbit so that his right eye was destroyed, also; the optic nerve had apparently been cut off. Considerable bleeding into the eye itself. And a fracture of the nose." These injuries indicated that the plaintiff had received a blow of "extreme velocity and swiftness."

From the foregoing circumstances, it is a legitimate inference that, as the plaintiff was doing his work, the wrench slipped from the head of the screw and escaped from his grasp, fell through one of the openings beside the cross-member of the clutch, struck the rapidly revolving spokes of the pulley and was violently thrown back by them, striking the plaintiff in the face. The violence of the blow, the position of the wrench after the accident, the plaintiff's position facing the clutch before he was struck and on the floor in front of the machine after he was struck, together with his testimony that something gave way as he was tightening the set screw, make this a reasonable conclusion as to what occurred, which is strengthened by the improbability of any other explanation of the force of the blow. *Lavallee* v. *Company*, 75 N. H. 579, 581; *Saad* v. *Papageorge*, 82 N. H. 294, 296, and cases cited.

2. In considering the contention that the plaintiff assumed the risk of being injured as he was, it is necessary to note carefully the extent of his experience. Having been the operator of this machine for thirty years, he was plainly chargeable with knowledge of the existence, construction and location of the pulley, and with an appreciation of the fact that the revolving spokes spelled danger. It may also be a necessary conclusion that this appreciation of danger included a realization that any loose object coming in contact with the spokes of the pulley might fly in any direction. See *Bennett* v. *Com-*

*pany,* 74 N. H. 400. But this general comprehension of the so-called "spoke peril" is not decisive of the plaintiff's case. If his injuries resulted from the spoke peril which he understood, plus other factors of danger of which he was ignorant, the doctrine of assumption of risk will not bar a recovery. "Voluntary assumption of risk merely negatives the duty to take care to provide safe conditions for association, and so prevents the failure to do so from being actionable negligence when the plaintiff's harm results, so far as the defendant's conduct is concerned, from this alone; it does not affect the defendant's duty in other particulars or the plaintiff's right to recover where his harm is caused by the breach of any duty owing by the defendant to him, nor is it in such case a defense that the defective condition was a concurrent and necessary cause of his harm." Bohlen, Studies in the Law of Torts, 519; 3 Labatt, M. & S., s. 1190; *Demars* v. *Company,* 67 N. H. 404, 406; *Boyce* v. *Johnson,* 72 N. H. 41, 45; *King* v. *Gardiner,* 76 N. H. 442.

The risk of injury involved in a particular piece of work comprises all the elements of danger which are present, and unless a servant's actual or constructive knowledge of those factors which enter into his injury is substantially complete, it cannot be said that he assumed the risk. Under no other circumstances can it be said that he "appreciated the risk of the particular danger" (*Fontaine* v. *Company,* 76 N. H. 163; *Zajac* v. *Company,* 81 N. H. 257) which caused his injuries. "One does not voluntarily assume a risk, within the meaning of the rule that debars a recovery, when he merely knows there is some danger, without appreciating the danger. *Mundle* v. *Company,* 86 Me. 400, 405." *English* v. *Amidon,* 72 N. H. 301, 302.

Although the plaintiff was an experienced operator, it might be found that he was not an experienced clutch-adjuster. There was evidence that up to June 25, 1927, the water mangle was located "down stairs" in the defendant's mill and that on that date it was moved to a new location up stairs. The plaintiff testified that before the machine was moved up stairs the machine shop men "used to attend to its upkeep and its adjustment." From this testimony it would be a fair inference that up to June 25, 1927, which was nine months before the date of the accident, April 8, 1928, the plaintiff had not been called upon to adjust the clutch, and he is, of course, entitled to the interpretation of the evidence most favorable to him. *Lyman* v. *Railroad,* 66 N. H. 200.

Subsequently the plaintiff testified as follows: "Q. And you say that after it got upstairs and the work increased the clutch began

to bother? A. Yes. Q. Did you take on any duties at any time in keeping this clutch going? A. Yes. Q. And when would you do that? A. Since Negus came there. Q. And what kind of adjustments would you make on it? A. A temporary adjustment." Mr. Negus was the superintendent of the bleachery and finishing department of the defendant, and from his testimony, it appeared that he came to the mill in February, 1926. From this evidence it is argued that the plaintiff commenced to adjust the clutch some two years before the accident occurred.

So far as this court is concerned, it is perhaps immaterial whether the period was nine months or two years, for in any event, it might be found that he had only been called upon to make adjustments at rare intervals. All the witnesses who testified upon the subject agreed that after the clutch was properly adjusted it would "run for months" without requiring any attention. One witness went so far as to say that "it ought to run for years." The plaintiff's testimony was that he had not made adjustments "many times." He also testified that he had never had any experience as a mechanic; that he had never "fixed machinery in any way, like automobiles, or done carpenter work, or things of that kind." There was also testimony of the well known fact that men differ greatly in their ability to handle tools, especially around machinery. So far as the plaintiff's actual knowledge was concerned, he testified that he "thought that wrench was all right," and did not think there was any chance of getting hurt in the way he was doing the work.

With such a slender basis of experience, it cannot be said, as a matter of law, that the plaintiff was chargeable with knowledge of the peculiar danger of this work referred to above, *i.e.*, that the shoe might "scuff" the rim of the pulley and cause the clutch to kick over, *Cooley* v. *Company*, 75 N. H. 529; *Riordan* v. *Company*, 81 N. H. 384, 388, nor is there anything in the evidence as to the plaintiff's experience which compels a conclusion that he knew or ought to have known the danger of using a large monkey-wrench on a small nut in the manner described above.

In *Demars* v. *Company*, 67 N. H. 404, the court had to deal with a similar situation and in the opinion it was said (*p.* 406): "His business as a carpenter may have afforded him little practical knowledge as a machinist; and the fact that on a few occasions he had readjusted the belt on the pulley and received no injury therefrom may have given him no sufficient information of the danger of the operation." The same point is stressed in *Bouthet* v. *Company*, 75

N. H. 581, 584, where it was said: "He had been employed in the mill as a laborer a year and a half. On occasions of varying frequence, he had been called upon to put the belt onto the pulleys. The knowledge he acquired was not that of a trained mechanic, but only that of a common laborer who sometimes did this particular piece of work." Similar considerations obviously apply to the case at bar. The plaintiff "testified that he did not know of the danger; and it cannot be said as a matter of law that it was, or reasonably ought to have been, obvious to a man of his age and knowledge." *Lapelle* v. *Company*, 71 N. H. 346, 349.

With respect to the defects in the wrench, it is argued that monkey-wrenches are in common use; that their operation is simple and readily observable; that if one jaw "wobbles" and does not meet the other squarely, that is apparent; and that the resulting difficulty of keeping a firm grip on the nut between the jaws is equally apparent.

If the correctness of the first two propositions be conceded, it cannot be said, as a matter of law, that the last two are correct as applied to the facts of the present case. It is a part of the common knowledge in regard to monkey-wrenches that there is generally some looseness of the movable jaw when not in use. Some such looseness seems to be unavoidable by reason of the principle upon which the tool operates, but under normal conditions it is readily taken up when the wrench is tightened on a nut. Consequently, even if it were observed that one jaw of the wrench in question wobbled, this would not in itself constitute a warning of danger that the wrench would not hold when applied to a nut.

As to the wear of the jaws of this wrench which prevented them from meeting squarely, it is not true that this defect was readily apparent to an unskilled person. It was observable only when the jaws were screwed together, and it would be imposing upon the plaintiff the master's duty of inspection to hold that he ought to have closed the wrench and examined the juxtaposition of the jaws before using it. He was, on the contrary, entitled to assume that the tools furnished by the defendant were reasonably safe for use. *Thompson* v. *Company*, 71 N. H. 174, 176. "The servant might not be required to know of the defect, or to appreciate its dangers, when the master would be required to do so, being charged with the duty of inspection and examination." *Whitcher* v. *Railroad*, 70 N. H. 242, 247. Hence it cannot be said, as a matter of law, that the plaintiff was chargeable with knowledge of the defects in this wrench or the resultant increase in the danger of slipping.

Consonant with these views is the testimony of defendant's expert upon cross-examination, as follows:

"Q. Let's get down to the question of the wrench; and with a wrench either defective or worn would you send him there to do that kind of work just the same?  A. Well, if I knew he had very defective wrenches I should caution him to use a better wrench. . . . Q. Well, what would be likely to happen that you would want to caution him; what would you caution him about?  A. Well, a wrench that needed repairing I wouldn't consider a proper wrench to use.  If it was broken or was of such a nature that it would slip."

It was plainly a legitimate inference that one or more of the foregoing factors of danger combined with the spoke hazard to bring about the plaintiff's injuries, and hence it is our conclusion that the question of his assumption of the risk was for the jury.  The following language from the opinion of this court in *Disalets* v. *Company*, 74 N. H. 440, 443, is equally applicable to the case at bar: "The gist of the plaintiff's case is that he did not know and appreciate the peculiar and extra hazard of doing the work in the way he did it. He was directed to do work without instructions which could be done in a reasonably safe way, but which was attended with increased hazard if done in some other way; to discover the safe way skill was required; hence the defendant ought to have instructed him."

In the light of the foregoing discussion, defendant's contention that the plaintiff was negligent in selecting the wrench which he used may be shortly disposed of.  Since he was not chargeable, as a matter of law, with knowledge of the dangers which its use involved, it cannot be held that he was careless in picking it out, even if there were other wrenches readily available—a point which is not conclusively settled by the evidence.

Defendant's other exceptions were expressly waived.

*Judgment on the verdict.*

SNOW and ALLEN, JJ., dissented: the others concurred.